## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3RED PARTNERS LLC,                  :

                                  :

                  Plaintiff,      :

                                  :

       v.                           :

                                  :

MOHAMMADAMIN KHAJEHNEJAD,   :

                                  :

                 Defendant.   :

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

Plaintiff 3Red Partners LLC ("3Red"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant Mohammadamin "Amin" Khajehnejad ("Khajehnejad"):

## <u>NATURE OF THE ACTION</u>

1.      3Red brings this action for breach of contract and violation of the Federal Trade Secrets Act and Illinois Trade Secrets Act because Khajehnejad failed to live up to the duties and obligations he owes 3Red by improperly and illegally retaining 3Red confidential information after voluntarily terminating his 3Red employment on May 17, 2020 with an effective date of June 15, 2020.

2.      Khajehnejad was hired by 3Red on August 1, 2012 as a Quantitative Researcher. 3Red was founded on June 21, 2011 by a manual trader and Khajehnejad was one of the very first employees who was brought on to build out the firm's algorithmic trading capabilities. A copy of Khajehnejad's Employment Agreement ("Agreement") is attached as Exhibit A.  In this role, Khajehnejad had access to 3Red's most valuable trade secrets, including 3Red's confidential and proprietary trading software and source code ("source code").  3Red launched

an investigation into Khajehnejad's activities after June 15, 2020. The results of the investigation were extremely disturbing.

3.      3Red learned from its investigation that Khajehnejad wiped his company owned laptop with two scrubbing software applications before returning the laptop to 3Red. In doing so, Khajehnejad violated 3Red policies a) stating that company-supplied technology, including computer systems and company-related work records, are the property of 3Red and b) dictating the manner in which they are utilized. Khajehnejad was not authorized to, and had no legitimate business reason to, wipe the laptop. Just as important and disturbing, Khajehnejad never told 3Red that he wiped the laptop before returning the laptop to 3Red.

4.      Khajehnejad also came into 3Red's office mere days before he resigned (and while the office was largely closed due to the COVID-19 pandemic) and deleted nearly all the files and folders from his desktop machine in a manner that made it virtually impossible to recover the information contained within these files and folders.

5.      Khajehnejad's deletion activity is highly unusual and, based upon information and belief, Khajehnejad accessed and then deleted the 3Red confidential information in these files and folders so that he could either a) use 3Red confidential information on behalf of, or provide 3Red confidential information to, a 3Red competitor or b) retain 3Red confidential information until after the one year restrictive covenants period in his Agreement expired. Khajehnejad also wiped his 3Red personal laptop the day after he accessed 3Red's source code (i.e. the day he resigned) in order to prevent 3Red from discovering his illegal activity.

6.      Khajehnejad's actions in wiping his 3Red laptop and accessing 3Red confidential information the day before he resigned from 3Red were not done in the performance of Khajehnejad's duties on behalf of 3Red. Instead, and based upon information and belief,

65400764v.4

Khajehnejad's actions were done for an improper purpose and to create the potential exposure of 3Red's confidential information to the public and/or a 3Red competitor.

7.     Accordingly, Khajehnejad violated and continues to violate both his 3Red Agreement, the Federal Trade Secrets Act and the Illinois Trade Secrets Act.

8.     3Red attempted to resolve Khajehnejad's violations of his 3Red Agreement, the Federal Trade Secrets Act and the Illinois Trade Secrets Act. During 3Red's discussions with Khajehnejad, Khajehnejad admitted to possessing additional 3Red confidential information and property. Specifically, Khajehnejad admitted to possessing two 3Red computers and multiple emails regarding 3Red projects.

9.     Khajehnejad also admitted to emailing 3Red information to his personal email account. The 3Red Employee Handbook explicitly prohibited Khajehnejad from sending 3Red confidential information to his personal email, with no exception for remote work. Khajehnejad's emails, according to Khajehnejad, included not only information on 3Red projects, but also two "scripts" that contained confidential information. Egregiously, Khajehnejad sometimes blind copied his personal email address when sending 3Red communications.

10.     Despite these admissions, Khajehnejad failed and refused to return the emails and computers owned by 3Red to 3Red. He also refused to allow 3Red to perform a reasonable search of his electronic devices in order to identify and remove all 3Red confidential information that is in Khajehnejad's possession, custody, and/or control.

11.     Consequently, 3Red now requests that this Court, among other things, enter an injunction enjoining Khajehnejad from using, possessing or disclosing 3Red confidential information. 3Red also requests that this Court order Khajehnejad to return all 3Red confidential information to 3Red. Finally, 3Red requests that this Court award 3Red the attorneys' fees and

65400764v.4

costs that 3Red incurs as a result of protecting its confidential information from Khajehnejad's illegal acts.

## THE PARTIES AND RELEVANT PERSONS

12.     3Red Trading LLC ("3Red") is an Illinois Limited Liability Company with its principal place of business located in Chicago, Illinois.

13.     Amin Khajehnejad ("Khajehnejad") is an Illinois resident who lives in Chicago, Illinois.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction, pursuant to 28 U.S.C. §1331, because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016, 18 U.S.C. §1832, et seq.  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Khajehnejad because Khajehnejad resides in this District, performed services for 3Red in this District, and conducted some of his illegal activity in this District.  Further, Khajehnejad agreed, as stated in Section 4.02 of the Agreement, "that any suit filed in connection with this Agreement shall be filed in the District Court for the Northern District of Illinois or in Illinois State Court in Cook County, Illinois."  In addition, 3Red negotiated and executed the Agreement in Illinois, and part of 3Red's performance under the Agreement occurred in Illinois.

## BACKGROUND

16.     3Red is, among other things, a proprietary algorithmic trading and electronic market making firm that buys and sells commodities and securities in order to provide two sided markets on many domestic and foreign exchanges.  3Red develops and deploys trading strategies by bringing a scientific approach to trading, while utilizing its sophisticated and confidential

4

research platform and development environment to continuously produce and execute trading alphas (signals), which have grown over the past 9 years. 3Red has approximately 50 employees and trades in markets located throughout the world.

17.    As a proprietary algorithmic trading firm, 3Red uses technology to create efficiencies and optimize its strategies. 3Red's technology and source code, which is highly confidential and proprietary, allows 3Red to perform its business through exchanges and other trading platforms that are highly-competitive, anonymous, computer-based, and accessed through computers.

18.    In addition to its technology, 3Red's confidential information also includes, among other things, trading methodologies, programming, statistical analysis, algorithmic developments, individual trader performance, trading performances, trading positions, commission rates, products traded, vendor relationships, trading strategies, and other knowledge, information, and property relating to the business, developments, activities and products of 3Red.

19.    3Red protects the confidential information described in paragraphs 17 and 18 by, among other things: limiting the disclosure and use of this information to only the 3Red employees who need this information to perform their duties on behalf of 3Red; developing and implementing procedures regarding the use and protection of confidential information; educating its employees about the requirements and necessity of keeping this information confidential; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; restricting access to its offices through the use of company identification cards; periodic e-mail monitoring, and requiring employees to execute written agreements that protect against the misuse and improper disclosure of 3Red's confidential information.

65400764v.4

20.     Consequently, all 3Red employees who have access to 3Red confidential information promise to not disclose the confidential information to anyone not authorized to receive it, and to not use 3Red confidential information for their own benefit or for any improper purpose.

### 3Red Hires Khajehnejad

21.     On or about August 1, 2012, 3Red hired Khajehnejad to be a Quantitative Researcher and was one of the first employees hired by 3Red to build out the firm's algorithmic trade capabilities.  A copy of Khajehnejad's Employment Agreement ("Agreement") is attached as Exhibit A.

22.     Khajehnejad's responsibilities as a Quantitative Researcher included, but were not limited to, Algorithmic Development, Programming, Statistical Analysis, Trading, Quantitative Research and other Market related duties. In this role, Khajehnejad was part of a core group of researchers who built and optimized a centralized research platform used for collaborative research.

23.     Khajehnejad would not have been hired as a Quantitative Researcher at 3Red unless he agreed to keep 3Red confidential information confidential.

24.     Indeed, both 3Red and Khajehnejad "recognize[d] and acknowledge[d] that the services of [Khajehnejad] are special and unique, and that, by reason of the relationship created by this Agreement, [Khajehnejad] is obtaining access to confidential information and other material aforesaid, **including any computer and computer software that is provided by 3Red, which must be returned at the time of termination.**"   (Agreement, §3.2, emphasis added).

25.     Not surprisingly then, Khajehnejad acknowledged, under Section 3.01(a) of the Agreement, that:

6

he may acquire certain knowledge, information, and property during his employment relating to the business, developments, activities or products of 3Red or the business affairs of any individual or firm doing business with 3Red, such as but not limited to, trading methodology, programming, statistical analysis, algorithmic development, individual trader performance, trading performance, trading positions, commission rates, products traded, vendor relationships and certain trading strategies. (Agreement, §3.01(a)).

26.     Khajehnejad further acknowledged that the above information is confidential and proprietary information of 3Red and, as such, Khajehnejad "agree[d] that any and all such knowledge, information, and property that may be obtained or is obtained by him in the course of his retention hereunder and his employment at 3Red are and will forever remain the valuable property of 3Red."  (*Id.*)

27.     Khajehnejad also promised to "conceal [all 3Red confidential information] from any competitor and all other persons," and to "not impart such knowledge, information, and property acquired by him to any person, firm, or company." (*Id.*)

28.     Similarly, and under Section 3.01(b) of the Agreement, Khajehnejad agreed that "everything developed and created by [him] in the course of his retention hereunder and his employment at 3Red, such as, but not limited to, trading methodology, programs, statistical analysis, algorithms, trading positions, commission rates, products traded, vendor relationships and certain trading strategies, is and will forever remain the valuable property of 3Red." (Agreement, §3.01(b)).

29.     As such, Khajehnejad agreed to conceal all 3Red confidential information "from any competitor and all other persons," and to "not impart such knowledge, information, or property … to any person, firm or company."  (*Id.*)

30.     Finally, Khajehnejad acknowledged that, "should his employment with 3Red terminate for any reason, he will not have any right to take with him and use such knowledge,

information, and property … unless [Khajehnejad] receives the express written consent of 3Red's Managing Members." (*Id.*)

31.     Consequently, [Khajehnejad] "expressly agree[d] that any breach or threatened breach of the provisions of this Agreement …. will cause 3Red serious, immediate, and irreparable injury, and shall entitle 3Red, in addition to any other legal remedies available to it, to apply to any court for an injunction, temporary and/or permanent, to prevent any violation of this Agreement, … and [Khajehnejad] recognize[d], acknowledge[d], and concede[d] that such injunction would, in those circumstances, be necessary to protect 3Red's interest.  (Agreement, §3.02).

32.     Khajehnejad also agreed that, in addition to injunctive relief, 3Red shall be entitled to "reasonable attorneys' fees and costs incurred by 3Red in connection with protecting 3Red confidential information."  (Agreement, §4.03).

**Khajehnejad terminates his 3Red employment to work for a competitor**

33.     Khajehnejad informed 3Red on May 17, 2020 that he would be terminating his 3Red employment and 3Red should consider his last date of employment as Friday May 15, 2020.  3Red froze Khajehnejad's access to his credentials and therefore 3Red's systems on May 17, 2020, and demanded the return of the laptop shortly thereafter.  Instead of returning the laptop after receiving 3Red's demands, Khajehnejad chose to run scrubbing software on the laptop and failed to return the laptop until June 8, 2020.

34.     According to Khajehnejad, he was leaving 3Red for a 3Red competitor. Khajehnejad initially offered to show 3Red his offer letter from the competitor so that 3Red could potentially match the offer.

8

35. Khajehnejad, however, is under a 12 month non-compete pursuant to the "NonCompetition Agreement" ("NCA") he signed on August 1, 2012. A copy of the NCA is attached as Exhibit B.

36. After being reminded of his NCA, Khajehnejad subsequently stated that he would not work for the competitor he had planned to go to work for or any 3Red competitor until his NCA expires on June 15, 2021. Unfortunately, Khajehnejad's statement did not apply to the 3Red confidential information in his possession, custody or control. Nor did Khajehnejad's statement protect against the 3Red confidential information that, based upon information and belief, Khajehnejad misappropriated before resigning from 3Red.

37. In fact, Khajehnejad failed (and continues to fail) to return any 3Red confidential information in his possession, custody or control, and also failed (and continues to fail) to promise to not use 3Red confidential information once his one year restrictive period expires.

### 3Red's Investigation of Khajehnejad

38. On or about June 8, 2020, Khajehnejad returned his company issued laptop to 3Red. Prior to his termination, Khajehnejad's laptop contained sensitive and proprietary confidential information concerning 3Red trading methodology, programming, statistical analysis, algorithmic developments, individual trader performance, trading performances, trading positions, commission rates, products traded, vendor relationships and certain trading strategies (collectively, "confidential information").

39. 3Red conducted an initial analysis of Khajehnejad's laptop and immediately discovered that Khajehnejad wiped clean his 3Red laptop before returning the laptop to 3Red.

65400764v.4

40.     Specifically and through its forensic review, 3Red learned that Khajehnejad ran a scrubbing application called "CCleaner" on May 22, 2020 and May 28, 2020.  Khajehnejad also ran another scrubbing application, "EraserPortable," on May 28, 2020.

41.     Khajehnejad was not authorized to wipe his 3Red laptop and never informed 3Red that he wiped, or was planning to wipe, the laptop.

42.     Despite Khajehnejad's efforts to wipe the 3Red laptop, 3Red was able to determine that Khajehnejad engaged in significant deletion activity between May 17, 2020 and May 28, 2020, after his resignation on May 17, 2020.  Khajehnejad's deletion activity included the deletion of his browser history and several files that contained 3Red confidential information.

43.     Between May 17, 2020 and May 28, 2020, Khajehnejad also deleted all desktop and download folders, as well as several application folders.  Based upon information and belief, several of these folders contained 3Red confidential information and, once again, Khajehnejad had no reason, as well as no authority, to delete these folders.

44.     Khajehnejad also deleted several files on the laptop between May 17, 2020 and May 28, 2020.  One such folder was titled "lynx_project."  3Red's forensic review of the laptop found "Git components" within the deleted folder.  Git is designed for coordinating work among programmers and can be used to track changes in any set of files.  Git's goals include speed, data integrity, and support for distributed, non-linear workflows.

45.     Finding Git components on the laptop is evidence that the laptop previously contained 3Red source code, which is 3Red's most highly confidential information.

46.     Since Khajehnejad wiped his computer, 3Red is unable to confirm whether Khajehnejad downloaded and/or transferred 3Red source code to another computer or flash drive before wiping the computer.

47.     Khajehnejad's nefarious activity is even more sinister given the fact that, despite a 12 month restrictive covenant and receiving severance payments, Khajehnejad was actively looking to work for a 3Red competitor when he was wiping his laptop. Moreover, this activity occurred during the time period after 3Red frequently requested that Khajehnejad return the 3Red issued computer, but Khajenejad refused to do so until June 8, 2020.

48.     Put differently, Khajehnejad received and accepted an offer from a 3Red competitor  and then wiped his 3Red laptop before giving notice of his resignation to 3Red.

49.     Based upon information and belief, Khajehnejad wiped his 3Red laptop in order to prevent 3Red from finding out that Khajehnejad had taken 3Red confidential information, including 3Red source code, and was planning to use 3Red confidential information at and on behalf of a 3Red competitor.

50.     Just as disturbing, 3Red's forensic investigation revealed that Khajehnejad installed "Telegram" in May 2020 (i.e. shortly before informing 3Red that he was going to a 3Red competitor).

51.     Telegram is an encrypted cloud-based instant messaging, videotelephony and voice over IP service that is used to send private and secure communications.  There was no legitimate business reason for Khajehnejad to install Telegram on his 3Red computer and, since Khajehnejad wiped the computer before returning the computer to 3Red, 3Red is unable to verify whether Khajehnejad sent 3Red confidential information through Telegram.

**Khajehnejad enters 3Red and accesses 3Red Confidential Information**

52.     On the Thursday before providing notice of his termination (May 14, 2020), Khajehnejad entered 3Red's offices.

11

53.     Khajehnejad entering 3Red's office on May 14th was unusual since Khajehnejad only intermittently worked at the office and had not accessed the office at all since March 13, 2020 due to the office closure resulting from the COVID-19 pandemic.

54.     On May 14th, Khajehnejad entered 3Red's Git repository and accessed 3Red source code. 3Red's source code is 3Red's most highly important and protected confidential information.

55.     Khajehnejad accessed 3Red source code yet did not make any changes to the source code on May 14th.  Nor did Khajehnejad save any work to the Git repository on the 14th.

56.     Khajehnejad's actions -- wiping his 3Red laptop; deleting his browser history, application folders and files from his laptop; and accessing 3Red source code before he resigned without saving his work -- are especially troubling since at the time of this nefarious activity, Khajehnejad was planning to work for a competitor.

57.     Accordingly, upon information and belief and based upon Khajehnejad's actions described above, Khajehnejad is in possession of 3Red confidential information and can therefore use that information on behalf of a 3Red competitor.

58.     This is true even if Khajehnejad honors the restrictions in his NCA because Khajehnejad can simply wait for the one year restrictive period in his NCA to expire and then take (or sell) 3Red's confidential information with him to a 3Red competitor.

**3Red attempts to resolve its dispute and concerns with Khajehnejad**

59.     3Red confronted Khajehnejad about the wiping of his 3Red laptop, his plans to work for a 3Red competitor in violation of the NCA, and his retention and continued possession of 3Red confidential information.

65400764v.4

60. Although Khajehnejad subsequently agreed to honor the terms of his NCA and not work for a competitor during the one year restrictive period, Khajehnejad refuses to provide reasonable assurances that he does not possess 3Red confidential information and will not use 3Red confidential information either during the one year restrictive period or after the one year restrictive period expires.

61. Khajehnejad has, however, provided startling new information about his retention of 3Red confidential information and property, and the need for injunctive relief.

62. Specifically, during 3Red's discussions with Khajehnejad, Khajehnejad admitted to possessing two 3Red computers.

63. Despite initially promising to return the computers and having no justifiable right to possess the computers, Khajehnejad is now refusing to return the 3Red computers in his possession and custody to 3Red.

64. Khajehnejad also admitted during his discussions with 3Red to possessing multiple emails regarding 3Red projects.

65. The emails, according to Khajehnejad, include two "scripts" that contain 3Red confidential information.

66. Just like the 3Red computers in his possession and despite lacking any justifiable right to possess the emails or scripts, Khajehnejad failed and is refusing to return the emails and scripts to 3Red.

67. He is also refusing to allow 3Red to perform a reasonable search of his electronic devices in order to identify and remove all 3Red confidential information that is in his possession, custody, and/or control.

65400764v.4

68.    Finally, Khajehnejad admitted during his communications with 3Red to writing source code during his 3Red employment and not disclosing the source code to 3Red.

69.    Under the Agreement, Khajehnejad agreed that "everything developed and created by [him] in the course of his retention hereunder and his employment at 3Red, such as, but not limited to, trading methodology, programs, statistical analysis, algorithms, trading positions, commission rates, products traded, vender relationships and certain trading strategies, is and will forever remain the valuable property of 3Red." (Agreement, §3.01(b)).

70.    Khajehnejad further agreed that:

> "should his employment with 3Red terminate for any reason, he will not have any right to take with him and use such knowledge, information, and property developed and created by [him] in the course of his retention hereunder and his employment at 3Red unless [he] receives the express written consent of 3Red's Managing Members. The decision regarding whether, after Employee's employment at 3Red is terminated, Employee can take with him and use such knowledge, information, and property developed and created by Employee in the course of his retention hereunder and his employment at 3Red is at 3Red's Managing Members' sole discretion." (*Id.*)

71.    3Red's Managing Members did not (and do not) consent to Khajehnejad retaining the source code he wrote while employed by 3Red.

72.    More importantly, by refusing to provide to 3Red the source code that he wrote during his 3Red employment but did not disclose to 3Red, 3Red has been unable to verify whether the source code has 3Red confidential information.

**Irreparable Harm to 3Red**

73.    Injury to 3Red is probable and imminent because Khajehnejad continuing to possess 3Red confidential information without 3Red's authorization or permission can and will cause significant harm to 3Red.

74.     This is especially true since Khajehnejad can provide the 3Red confidential information that is illegally in his possession to a 3Red competitor, and the competitor can then use 3Red's confidential information.

75.     Khajehnejad can also publicly disseminate the 3Red confidential information that is illegally in his possession, thereby destroying the economic and non-economic benefits 3Red receives as a result of the confidential information being confidential. Such harm would be difficult, if not impossible, to calculate.

76.     Accordingly, 3Red is suffering irreparable harm, and injunctive relief is necessary and appropriate to prevent further damage to 3Red.

### COUNT I
### (Violation of the Defend Trade Secrets Act)

77.     3Red repeats and realleges paragraphs 1 through 76 of the Complaint, as if fully set forth herein.

78.     During the course of his employment with 3Red, Khajehnejad was provided access to substantial amounts of 3Red confidential information, including the confidential information identified in Paragraphs 17, 18, 24, 25, 28, 54, 64 and 65.

79.     For instance, Khajehnejad had access to 3Red technology, trading methodologies, programming, statistical analysis, algorithmic developments, individual trader performance, trading performances, trading positions, commission rates, products traded, vendor relationships, trading strategies, and other knowledge, information, and property relating to the business, developments, activities and products of 3Red.

80.     This information is not available to the general public and is closely guarded by 3Red. 3Red keeps such information strictly confidential in order to protect and maintain its competitive advantage. The economic value of this information is over $1,000,000.

15

81.     3Red confidential information, including the confidential information identified in Paragraphs 17, 18, 24, 25, 28, 54, 64, 65 and 79 is a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, et seq. ("DTSA"), because the information is not generally known outside of 3Red, the information is not generally known by employees and others involved in 3Red's business, 3Red has taken reasonable measures to guard the secrecy of the information, the information is of great value to 3Red, 3Red invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because 3Red continuously uses the information in its business.

82.     Khajehnejad was legally and contractually obligated to return 3Red confidential information to 3Red immediately upon termination of the Agreement and his employment.

83.     Khajehnejad therefore knows that he is no longer authorized to receive, possess, or access 3Red confidential information.

84.     Unfortunately, Khajehnejad  has ignored (and continues to ignore) his contractual obligations to 3Red and continues to retain 3Red confidential information.

85.     Unless restrained, and based upon the activity described above, Khajehnejad will use, divulge, and/or disclose 3Red confidential information.

86.     Furthermore, actual or threatened misappropriation of confidential information may be enjoined under the DTSA.

87.     It is axiomatic that if Khajehnejad continues to possess 3Red confidential information, then Khajehnejad has no intention of complying with the DTSA.

88.     Consequently, Khajehnejad's actions constitute the actual and/or threatened misuse of 3Red confidential information.  Injunctive relief against Khajehnejad is therefore appropriate.

89.     Naturally then, 3Red requests an order enjoining Khajehnejad from accessing, using or possessing 3Red confidential information.

90.     3Red further requests an order requiring Khajehnejad to return any and all 3Red confidential information to 3Red.

91.     Finally, Khajehnejad's misappropriation of 3Red confidential information has been willful and malicious.  As a result, 3Red is entitled to recover its attorneys' fees from Khajehnejad.

## COUNT II
### (<u>Breach of Contract</u>)

92.     3Red repeats and realleges paragraphs 1 through 91 of the Complaint, as if fully set forth herein.

93.     On or about August 1, 2012, 3Red hired Khajehnejad to be a Quantitative Researcher.  (Agreement, Exhibit A).

94.     Khajehnejad promised under the Agreement to return all confidential information to 3Red when his Agreement terminated.  (Agreement, §3.2).

95.     Khajehnejad also promised to "conceal [all 3Red confidential information] from any competitor and all other persons," and to "not impart such knowledge, information, and property acquired by him to any person, firm, or company." (Agreement, §3.01).

96.     Finally, Khajehnejad promised that, "should his employment with 3Red terminate for any reason, he will not have any right to take with him and use such knowledge, information, and property … unless [Khajehnejad] receives the express written consent of 3Red's Managing Members."  (*Id.*).

65400764v.4

97. Khajehnejad never asked for, nor received, permission from 3Red's Managing Members to access, possess or use 3Red confidential information after his 3Red employment terminated.

98. 3Red has performed all of the duties and obligations it owes Khajehnejad under the Agreement.

99. Khajehnejad breached the Agreement, and continues to breach the Agreement by failing to return 3Red confidential information, and using and possessing 3Red confidential information.

100. 3Red is therefore subject to continuing irreparable harm and has no adequate remedy at law. Thus and unless injunctive relief is granted, 3Red will continue to be irreparably harmed by Khajehnejad's breach of the Agreement.

101. 3Red therefore requests that this Court grant injunctive relief against Khajehnejad that prohibits Khajehnejad from possessing, using and/or disclosing 3Red's confidential information, and also orders Khajehnejad to return all 3Red confidential information in his possession, custody or control to 3Red.

102. Finally, Khajehnejad agreed that, in addition to injunctive relief, 3Red shall be entitled to "reasonable attorneys' fees and costs incurred by 3Red in connection with protecting 3Red confidential information." (Agreement, §4.03).

103. Accordingly, Khajehnejad is responsible for the attorneys' fees and costs 3Red incurs in this litigation.

## COUNT III
### (Violation of Illinois Trade Secrets Act)

104. 3Red repeats and realleges paragraphs 1 through 103 of the Complaint, as if fully set forth herein.

18

105. During the course of his relationship with 3Red, Khajehnejad was exposed to substantial amounts of 3Red confidential information, including the confidential information identified in Paragraphs 17, 18, 24, 25, 28, 54, 64, 65 and 79.

106. For instance, Khajehnejad had access to 3Red technology, trading methodologies, programming, statistical analysis, algorithmic developments, individual trader performance, trading performances, trading positions, commission rates, products traded, vendor relationships, trading strategies, and other knowledge, information, and property relating to the business, developments, activities and products of 3Red.

107. This information is not available to the general public and is closely guarded by 3Red. 3Red keeps this information strictly confidential in order to maintain a competitive advantage over its competitors.

108. This information is considered a trade secret under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS § 1065/et al., because 3Red derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

109. The economic value of the 3Red trade secrets/confidential information that Khajehnejad had access to under the Agreement is over $1 million.

110. Under the ITSA, "actual or threatened misappropriation [of trade secrets] may be enjoined." 765 ILCS at § 1065/3(a).

111. Khajehnejad's actions described above constitute the "actual" and "threatened" misuse and/or misappropriation of 3Red trade secrets. (Confirm with FTI)

112. As a result, injunctive relief is therefore appropriate.

65400764v.4

113.     Accordingly, 3Red requests that this Court enter an order enjoining Khajehnejad from using, possessing or accessing any 3Red confidential information and from disclosing 3Red confidential information to anyone not authorized to receive the confidential information.

114.     3Red also requests that this Court enter an order requiring Khajehnejad to return any and all 3Red confidential information.

115.     Finally, Khajehnejad's misappropriation of 3Red confidential information has been willful and malicious.  As a result, 3Red is entitled to recover its attorneys' fees from Khajehnejad.

**WHEREFORE**, Plaintiff 3Red Partners, LLC respectfully requests that this Court:

1.     Enter an injunction enjoining and restraining Amin Khajehnejad, and his agents, representatives, servants, employees, and all those acting in concert or participation with him, from using, accessing or possessing any AIC and/or ALIC confidential information;

2.     Enter an order requiring Khajehnejad to return all 3Red confidential information and property in his possession, custody or control to 3Red;

3.     Award 3Red the reasonable attorneys' fees and costs incurred by 3Red in connection with protecting 3Red confidential information; and

4.     Award 3Red such other relief as the Court may deem just and proper.

65400764v.4

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Steve Strohmer, on behalf of 3Red Partners LLC declare under penalty of perjury that the statements set forth in the foregoing Verified Complaint for Injunctive and Other Relief are true and correct except as where such statements are made upon information and belief.


Dated: August 27, 2020

_____

Steve Strohmer

Dated:  August 27, 2020

Respectfully submitted,

3RED PARTNERS, LLC

By: */s/ J. Scott Humphrey*
    One of Its Attorneys

    J. Scott Humphrey
    Kristine R. Argentine
    Emily Kesler
    Seyfarth Shaw LLP
    233 S. Wacker Drive
    Suite 8000
    Chicago, Illinois 60606
    Phone:    (312) 460-5000
    Fax:       (312)-460-7000

    *Attorneys for Plaintiff 3Red Partners, LLC*

65400764v.4

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 27, 2020 he caused a true and correct copy of the foregoing Plaintiff's Verified Complaint for Injunctive and Other Relief to be served in compliance with Federal Rule of Civil Procedure 4 upon Defendant.


*/s/ J. Scott Humphrey*_____
J. Scott Humphrey

65400764v.4